| | |
|---|---|
| MEGHAN GIGLIOTTI,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>NANCY BERRYHILL, COMMISSIONER,<br>SOCIAL SECURITY ADMINISTRATION<br><br>　　　Defendant. | No. 3:17-cv-00028 (MPS) |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of Meghan Gigliotti's application for disability insurance benefits. Ms. Gigliotti appeals pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),[1] and moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"). In the alternative, Ms. Gigliotti seeks an order remanding her case for a rehearing. The Commissioner, in turn, has moved for an order affirming the decision.

Ms. Gigliotti argues that the Administrative Law Judge ("ALJ") improperly assessed her credibility, accorded too little weight to the opinions of her treating physicians and too much weight to those of agency consulting physicians, and improperly determined her residual

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. The Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

functional capacity ("RFC"), thereby erroneously finding that Ms. Gigliotti could return to work. I disagree and conclude that the ALJ's decision was supported by substantial evidence. I therefore AFFIRM.

## I.    FACTUAL BACKGROUND

### A.  The Claimant

Ms. Gigliotti was born on February 6, 1965, and was 50 years old at the time of her hearing. (Record page ("R.") 45.) She most recently worked as a health unit clerk. (R. 69.) Ms. Gigliotti applied for disability benefits on January 28, 2013, claiming that she had been disabled since December 20, 2011. (R. 26, 200-03.)[2] Her Date Last Insured was September 30, 2016. (R. 25.) Defendant initially denied her application for benefits on March 7, 2013. (R. 102-05.)

### B.  Medical History

The relevant medical evidence is set forth in a Joint Medical Chronology filed by the parties (ECF No. 16-2), which the Court adopts and incorporates by reference herein. The following is a summary of that chronology.

#### 1.  Medical Evidence Before the Alleged Onset Date

---

[2] The ALJ's decision states that "[o]n January 22, 2013, the claimant filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning February 24, 2010 . . . . At [the] hearing, the claimant amended her alleged onset date to December 20, 2011." (R. 23.) The parties do not dispute this statement. However, the parties both suggest that the alleged onset date was February 24, 2010, though Ms. Gigliotti's application for disability benefits states, "I became unable to work because of my disabling condition on December 20, 2011." (R. 200.) The transcript of the hearing is unclear, as the page that apparently includes testimony about the alleged onset date is missing from the transcript provided to the Court. (*See* R. 44-45, spanning pages 7 and 9 of the hearing transcript, omitting page 8. Transcript p. 45 states, "ALJ: Okay. And so that is the onset date that we're going to be using? Atty: Yes, sir. ALJ: Okay." The earlier part of this colloquy is not in the record.).  Because neither party challenges the ALJ's decision on this ground, the Court need not consider whether the discrepancy affects the soundness of the ALJ's decision.

On September 14, 2009, after having a neurology consultation with Dr. Robert Thornton, who noted that Ms. Gigliotti was experiencing paresthesias in the digits of her right hand, Ms. Gigliotti had an MRI of her lumbar spine, which showed right paracentral disc herniation. (R. 800, 821.) On September 16, 2009, Ms. Gigliotti underwent an EMG study that showed right ulnar neuropathy with evidence of a partial conduction delay across the elbow segment, as well as radiculopathy[3] with features of acute and chronic denervation. (R. 823.) She underwent a lumbar x-ray on October 23, 2009, which showed degenerative disease and facet arthropathy. (R. 796.) On December 21, 2009, Ms. Gigliotti received facet joint injections for chronic low back pain. (R. 797-98.) In a follow-up appointment with neurosurgeon Dr. Thomas J. Arkins on December 23, 2009, Dr. Arkins recommended that Ms. Gigliotti undergo a disc excision and fusion procedure. (R. 783.) On January 26, 2010, Ms. Gigliotti had a CT scan of her lumbar spine, which revealed mild left convex scoliosis, mild loss of disc height, disc bulging, and disc protrusion that is associated with endplate spurring and mild encroachment of the neural foramen. (R. 780.) The same day, Ms. Gigliotti underwent a discogram surgery for chronic lumbar spondylosis.[4] (R. 323, 460, 466.) On February 2, 2010, Dr. Arkins recommended that Ms. Gigliotti undergo decompression and discectomy surgery. (R. 792.)

On February 24, 2010, Ms. Gigliotti underwent a lumbar decompression procedure for spondylosis. (R. 454-59, 464, 763-72, 778.) Two weeks later, she complained of numbness in her left leg but reported that her nerve pain was gone and that she felt better than she had before the

---

[3] Radiculopathy refers to "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." *Radiculopathy*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/radiculopathy (last visited January 8, 2018).

[4] Spondylosis refers to a degenerative process affecting the vertebral disc and facet joints that gradually develops with age. *Spondylosis Definition*, Spine-Health.com, https://www.spine-health.com/glossary/spondylosis (last visited January 8, 2018).

surgery. (R. 324.) On March 16, 2010, Ms. Gigliotti was admitted to the hospital for two days for spondylosis and back pain. (R. 454.) An April 8, 2010 lumbar spine x-ray showed maintenance of anatomic segmentation and stable positioning of hardware, as well as no evidence of progressive disc degeneration, following Ms. Gigliotti's lumbar decompression. (R. 757.) That day, Ms. Gigliotti reported to Dr. Arkins complete relief of leg pain, but increased back pain, because she was more active. (R. 325.) Dr. Arkins asked her to try gradually to mimic work activity for six to seven weeks before she was due to return to work.

On May 20, 2010, Dr. Arkins noted that Ms. Gigliotti was able to return to work four hours per day without restrictions, and advised as much in a letter addressed "[t]o whom it may concern" on May 22, 2010. (R. 326-327.) On June 21, 2010, Ms. Gigliotti reported sacroiliac pain extending to the mid-lumbar spine and deep pain in the buttock to Dr. Arkins, but stated that she believed she could work six hours per day. (R. 329.) Dr. Arkins wrote a letter advising that Ms. Gigliotti could return to work as of June 28, 2010 for six hours per day without restrictions. (R. 328.) After returning to work, Ms. Gigliotti asked Dr. Arkins on July 26, 2010 to be released to work full-time, eight hours per day. (R. 331.) Dr. Arkins advised her to stop smoking cigarettes as complete cessation was necessary to assure solid fusion of her hardware. (*Id*.) As of September 17, 2010, Ms. Gigliotti continued to take Vicodin and Neurontin three times a day for burning in her left foot and calf and continued to smoke cigarettes. (R. 332.) A December 30, 2010 lumbar MRI showed that Ms. Gigliotti's vertebral bodies were well aligned without evidence of subluxation; the same day, Ms. Gigliotti reported trouble when she could not get up and move throughout the day, but that her back pain was "far, far less than it was preoperatively and she [was] very pleased that she had surgical treatment." (R. 333, 474.)

On January 26, 2011, Dr. Arkins completed a report for the Connecticut Department of Labor indicating that it was necessary for Ms. Gigliotti to leave her job because she could not function with her hands because of numbness and lumbar pain. (R. 689.) Dr. Arkins could not determine when she would be able to work full time. (*Id*.) On February 24, 2011, Dr. Arkins noted during a follow-up appointment that Ms. Gigliotti's x-rays showed solid fusion, that she had less pain after surgery and no longer had a foot drop,[5] but that she had significant numbness in her right foot and continued to take Vicodin and Neurontin. (R. 334, 472, 681.) Dr. Arkins opined that Ms. Gigliotti was "fully functional and active." (R. 334.)

In a consultation with pain specialist Dr. David B. Glassman, Ms. Gigliotti reported low back and leg pain but that opioid medication gave her pain relief; on examination, her gait was slightly antalgic and her straight leg raising was positive on the left more than on the right while sitting. (R. 343.) Dr. Glassman encouraged activity as tolerated, alternating ice and moist heat as needed, and daily exercise and stretching. (R. 344.) Ms. Gigliotti had various treatments for pain throughout 2011, including steroid, nerve block, and trigger point injections. (R. 349, 360-61.) A cervical MRI on August 25, 2011 showed moderate spondylosis but no cord compression or large herniation. (R. 526.)

Ms. Gigliotti saw Dr. Arkins for left arm symptoms and numbness in the left hand on October 11, 2011. (R. 335.) Upon examination, extension of the neck provoked mild numbness in the left arm, but she showed no weakness in either arm nor atrophy in the hand. (*Id*.) She had diminished reflexes in her arms but her balance and strength appeared normal. (R. 336.) On November 1, 2011, Dr. Arkins noted mild weakness of abduction in the second and third fingers

---

[5] Foot drop is a general term for difficulty lifting the front part of the foot. *Foot drop*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/foot-drop/symptoms-causes/syc-20372628 (last visited January 8, 2018).

but otherwise intact grasp strength, opposition, abduction, and adduction, and no left hand paresthesias. (R. 338.) On December 2, 2011, Dr. Arkins noted that Ms. Gigliotti "remained clumsy in the left arm" but "not because of weakness," and that he was "perplexed diagnostically." (R. 339.) On December 13, 2011, Ms. Gigliotti underwent a procedure for percutaneous placement of epidural leads and a SCS [spinal cord stimulator] trial. (R. 368-69, 452-53.)

### 2. Medical Evidence After the Alleged Onset Date

Ms. Gigliotti had a chest MRI on December 22, 2011, which showed reversal of the normal cervical lordosis and mild disc bulges. (R. 467-68.) In a neurological consultation with Dr. Samuel Bridgers on January 18, 2012, Ms. Gigliotti complained of numbness in her left hand, paresthesia extending up to her forearm, neck pain, loss of power in her left hand, and inability to grip and squeeze with her left hand. (R. 699.) Examination showed only mild limitation of cervical motion and tenderness on the left arm and unremarkable gait. (R. 700.) Dr. Bridgers diagnosed her with radiculopathy. (*Id.*)

Dr. Arkins opined in a follow-up appointment on January 26, 2012 that Ms. Gigliotti "is not work-capable" after Ms. Gigliotti complained of increased lumbar pain. (R. 340.)

On February 21, 2012, Ms. Gigliotti underwent a CT myelogram[6] of the cervical spine, which showed no significant central canal stenosis and only minimal degenerative changes. (R. 694-95.) A lumbar spine CT myelography showed no significant canal or neuroforaminal stenosis, progression of anterior osseous fusion, and only minimal degenerative changes. (R. 681-82.) On March 2, 2012, Dr. Arkins observed no evidence of nerve root compression or mass, though EMGs

---

[6] A myelogram is a diagnostic imaging test that uses a contrast dye or computed tomography ("CT") to look for problems in the spinal canal. *See* Johns Hopkins Medicine Health Library, https://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/myelogram_92,P07 670 (last visited January 2, 2018).

revealed the possibility of ulnar neuropathy; Dr. Arkins noted there was no surgical solution to Ms. Gigliotti's left arm pain and intermittent sciatic pain, and advised that if she increased her activities, she might worsen her condition. (R. 341.) Ms. Gigliotti continued to receive epidural steroid injections through 2012. (R. 381, 429, 642.)

In a neurosurgical consultation with Dr. Judith Gorelick on December 7, 2012, Ms. Gigliotti complained of leg heaviness and weakness and numbness of the left upper extremity. (R. 615.) Dr. Gorelick saw no evidence of discrete cervical radiculopathy or peripheral nerve entrapment and noted an unremarkable imaging study. (R. 616.) In a December 11, 2012 neurological consultation for left arm numbness with Dr. Joshua Hasbani, Ms. Gigliotti had a normal motor examination, with full strength in the upper and lower extremity, normal sensation except for diminished sensation of temperature and light touch, normal coordination, and normal reflexes with a bilaterally absent Babinski sign. (R. 394.) Dr. Hasbani noted that the examination was only notable for subjective sensory loss in the left arm in a nonspecific dermatomal distribution; because he did not find specific dermatomal numbness in the left upper extremity and because Ms. Gigliotti had full strength, he elected not to repeat nerve conduction studies at that time. (R. 395.) In a neurological reevaluation with Dr. Hasbani on January 10, 2013, Ms. Gigliotti had a normal motor examination with full strength in the upper and lower extremities, normal sensation, and normal reflexes and gait. (R. 391.) Dr. Hasbani diagnosed her with thoracic outlet syndrome.[7] (R. 392.)

---

[7] Thoracic outlet syndrome is a group of disorders that occur when blood vessels or nerves in the space between the collarbone and the first rib are compressed, which can cause pain in the shoulders and neck and numbness in the fingers. *Thoracic outlet syndrome*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/thoracic-outlet-syndrome/symptoms-causes/syc-20353988 (last visited January 8, 2018).

In a neurological evaluation with Dr. Moshe Hasbani on February 24, 2013, Ms. Gigliotti's upper extremity muscle strength was nearly normal in all groups and she had no radicular symptoms. (R. 514-15.) Dr. Hasbani opined that she probably had thoracic outlet syndrome and required further evaluation. (R. 609.)

In a neurological evaluation with Dr. Gorelick on July 12, 2013, Ms. Gigliotti demonstrated good strength in the lower extremities bilaterally and no significant foot drop on the left. (R. 571.) She ambulated with a steady gait. (*Id*.) Dr. Gorelick opined that Ms. Gigliotti had symptoms of increasing weakness and paresthesias of the left lower extremity of unclear causation. (*Id*.)

On December 12, 2013, Dr. David Kloth noted that based on an MRI of her cervical spine, Ms. Gigliotti had multilevel disease, which correlated with her left upper extremity and hand problems. (Tr. 870.) Dr. Kloth noted on March 5, 2014 that after a lumbar branch mapping procedure, Mr. Gigliotti had increased sitting tolerance and decreased pain, but no significant improvement on a sustained basis. (R. 866.) Ms. Gigliotti underwent a left sacroiliac joint mapping procedure on March 26, 2014. (R. 864.)

On April 21, 2014, Dr. Kloth noted in a reevaluation that Ms. Gigliotti's hip x-ray did not reveal significant arthritis, despite her continuing to have deep pain within her hip. (R. 860.) Dr. Kloth noted that Ms. Gigliotti had chronic radiculopathy. (*Id*.) On June 3, 2014, Dr. Kloth noted that Ms. Gigliotti's most recent lumbar MRI revealed progression of disease above her fusion but did not recommend surgery. (R. 858.) Ms. Gigliotti continued to have epidural steroid injections through 2014, but continued to have pain in her left lumbar region. (R. 846, 848, 849, 851, 857.)

On February 23, 2015, Ms. Gigliotti reported a significant reduction of her symptoms with an almost 80% reduction of pain after undergoing a left cervical facet block earlier that month. (R. 839.) Ms. Gigliotti continued to have burning on the left side of her neck, but which did not travel

down her arm. (R. 838.) In a March 9, 2015 reevaluation, Dr. Kloth opined that Ms. Gigliotti had had a cerebrovascular accident[8] ("CVA"), as she had weakness, numbness, and tingling in her left hand. (*Id*.)

### C. Hearing Before the ALJ

An ALJ held a hearing on March 31, 2015, at which Ms. Gigliotti testified. (R. 38-80.) Ms. Gigliotti testified that after her back surgery she was out of work for nine months before returning to a full-time capacity. (R. 54.) She said she initially felt better, but that her condition deteriorated when she resumed her daily activities and returned to work. (R. 63.) Ms. Gigliotti said that she was released to return to work part time, for four-hour shifts, but that she had a difficult time sitting for four hours. (R. 51.) She attempted to return for eight-hour shifts, but she found she was unable to remain seated due to sciatic pain, and she needed to walk and stretch throughout the day. (R. 51, 65-66.)

Ms. Gigliotti testified that she is no longer able to lift groceries or carry baskets of laundry, and that she experiences pain from the center of her back, down to her buttock on the left side and the bottom of her left foot. (R. 51-52.) At the time of the hearing, her children helped her with taking things "in and out of the stove." (R. 61.) She testified that her pain is constant and is only lessened, but not eliminated, by hot showers and medication. (R. 52.) Neither physical therapy nor an implanted spinal cord stimulator helped eliminate her pain. (R. 54.)

Ms. Gigliotti further testified that she is limited in using her left hand, and that only her thumb and pointer finger on her left hand "work." (R. 52.) She testified that she has weakness in her hands and is not able to lift or hold anything with her left hand. (R. 52.) Ms. Gigliotti said that

---

[8] A cerebrovascular accident is the medical term for a stroke. *Cerebrovascular Accident*, Healthline.com, https://www.healthline.com/health/cerebrovascular-accident (last visited January 8, 2018).

she can sit or stand comfortably for approximately 15 to 20 minutes, and that if a task takes longer than that, she must sit down for 15 to 30 minutes before standing again. (R. 57-58.) She can lift two to three pounds and needs help from her children with heavy lifting. (R. 58-59.) She can bend "but not for any length of time." (R. 58.) She can drive for a maximum of 45 minutes to one hour due to back pain. (R. 62.) Ms. Gigliotti testified to having episodes of extreme back pain two to five times per year, and said she spent three months on a recliner in February 2013 due to back pain. (R. 59, 62.) Ms. Gigliotti testified that she took Vicodin and Motrin for pain, as well as baby aspirin and another medication that she did not know the name of. (R. 55.) She smoked one pack of cigarettes per day. (R. 56.)

A vocational expert also testified at the hearing. The vocational expert testified that an individual of Ms. Gigliotti's age, education, and past relevant work experience, who could perform sedentary work only and was not able to climb ladders, ropes or scaffolds, who could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl, and who could only occasionally finger and handle with the left non-dominant hand, could work as a food checker, clerical sorter, and telephone solicitor. (R. 74-75.) The vocational expert further testified that a person with the same age, education, past relevant work experience, and who had the same restrictions discussed above, except who could frequently finger and handle with the left hand, could work in Ms. Gigliotti's past role as a health unit clerk. (R. 73.)

### D. The ALJ's Decision

The ALJ found that Ms. Gigliotti suffered from cervical and lumbar degenerative disc disease, peripheral neuropathy, and cerebrovascular accident with late effects of cerebrovascular disease, all of which were severe impairments. (R. 26.) The ALJ further found that Ms. Gigliotti did not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(a), 404.1525, and 404.1526. (R. 26.)

The ALJ determined that Ms. Gigliotti had "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can never climb ladders, ropes, and scaffolds." The ALJ concluded that she could "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can perform frequent fingering and handling with the left hand." (R. 27.) The ALJ considered Ms. Gigliotti's indication that "her ability to work is limited by degenerative disc disease," including that "she needs assistance to perform daily chores," and that "she must walk and sit in half-hour increments." (R. 27.) The ALJ considered, among other evidence in the record, Ms. Gigliotti's testimony that "she still has chronic and severe neck and back pain that limit physical activity," that "she experienced a stroke and has residual difficulties with her left hand causing only her thumb and pointer fingers to work," and that "her lower back pain has persisted in severity despite surgical fusion and spinal stimulator implantation." (R. 27.)

The ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Ms. Gigliotti's "statements concerning the intensity, persistence and limited effects of these symptoms [were] not entirely credible . . . ." (R. 27.) Specifically, the ALJ concluded that while the "objective medical evidence provide[d] some support to the claimant's allegations . . . .[,] it [did] not support the elevated level of impairment alleged . . . . Despite her subjective complaints of ongoing difficulties, physical examinations have generally shown that she retains full motor strength throughout all extremities with frequently normal gait." (R. 28.) The ALJ found that Ms. Gigliotti was able to return to her past work as a health unit clerk, and that she was not disabled at any point since December 20, 2011. (R. 31.)

### E. Appeals Council Decision

On November 4, 2016, the appeals council denied Ms. Gigliotti's request for review of that decision, thereby making the ALJ's decision the final decision of the Commissioner. (R. 6-11.) This appeal followed.

### II. <u>LEGAL STANDARD</u>

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[9] To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"A district court reviewing a final . . . decision pursuant to . . . 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The

---

[9] The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4).

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (internal citation and quotation marks omitted). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.* If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). "Thus, as a general matter, the reviewing court is limited to a fairly deferential standard." *Crossman v. Astrue*, 783 F. Supp. 3d 300, 303 (D. Conn. 2010) (quoting *Gonzalez v. Comm'r*, 360 F. App'x 240, 242 (2d Cir. 2010) (summary order)) (internal quotation marks omitted).

## III. DISCUSSION

Ms. Gigliotti raises three issues in her challenge to the Commissioner's denial of benefits: (1) whether the ALJ properly assessed her credibility; (2) whether the ALJ violated the treating physician rule and whether the ALJ accorded too much weight to the opinions of non-examining consulting physicians; and (3) whether the ALJ's RFC determination was supported by substantial evidence.

### A. Credibility Findings

Ms. Gigliotti first argues that the ALJ's finding that she was "not fully credible regarding her allegedly substantial functional deficits" was "not supported by good reason or by substantial evidence." (ECF No. 16-1 at 8.) Ms. Gigliotti argues that while some of her medical records reflect "mild" impairments, others show severe limitations, including degenerative disc disease and upper extremity and hand problems. I find that substantial evidence supported the ALJ's credibility findings.

"It is the function of the [ALJ], not the reviewing courts, . . . to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . , but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted); *see also Pietrunti v. Dir., Office of Workers' Comp. Progs.*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("As a fact-finder, the ALJ has discretion to evaluate the credibility of a claimant. . . .").

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(b)).

The ALJ properly followed the two-step process, first finding that Ms. Gigliotti's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" before finding that the "objective medical evidence . . . . [did] not support the elevated level of impairment alleged." (R. 27-28.). At the second step, the ALJ cited objective medical evidence in the record reflecting mild physical examination results. For example, the ALJ referenced a February 2012 CT myelogram of Ms. Gigliotti's cervical spine showing "no significant central canal stenosis and only minimal degenerative changes." (R. 30; R. 480). The ALJ's conclusion that there was "little mention" of lower extremity problems in the record, and that Ms. Gigliotti demonstrated only mild gait problems and overall no foot drop (R. 29) was supported by May 20 and June 15, 2013 treatment notes by Dr. Glassman describing a "slightly antalgic gait" and "no foot drop" upon examination, as well as a July 12, 2013 note by Dr. Gorelick stating that she did "not detect any significant foot drop on the left," and that Ms. Gigliotti "ambulate[d] with a steady gait." (R. 489, 493, 571.) The ALJ's determination that "she had mild weakness of abduction of the second and third fingers away from each other," but that "her strength of grasp, opposition, abduction, and adduction appeared intact," despite her arm complaints (R. 29), was also supported by a November 2011 physical examination note by Dr. Arkins. (R. 338.) The ALJ's determination that her "left arm/hand weakness had increased" in 2013, but that "her digit/hand/arm strength were within normal limits and equal bilaterally" was supported by Dr. Glassman's April 19, 2013 physical examination. (R. 30; R. 496.) The ALJ also took into account "the residual effects of [Ms. Gigliotti's] reported cerebrovascular accident," which Dr. Kloth noted

was "small" and resulted in "some chronic weakness, numbness and tingling of her left hand." (R. 29, 838.)[10]

Other objective medical evidence supports the ALJ's conclusion that Ms. Gigliotti's impairments were not severe. (*See, e.g.*, a January 26, 2010 CT scan of her lumbar spine showing "mild left convex scoliosis," and "mild loss of disc height (R. 780); an October 11, 2011 examination with Dr. Arkins showing that "extension of the neck does provoke mild increase in numbness in the left arm," but showing "no weakness of deltoid, biceps, triceps, wrist extension, finger extensors, finger abductors, adductors, grasp or opposition in either arm" and "no evidence of atrophy of the muscles of the hand" (R. 336); a November 1, 2011 examination with Dr. Arkins showing "mild weakness of abduction in the second and third fingers" but otherwise intact grasp strength, opposition, abduction, and adduction, and no left hand paresthesias (R. 338); a December 22, 2011 MRI showing "mild disc bulges" (R. 467); a January 18, 2012 examination with Dr. Bridgers showing "only mild limitation of cervical motion" (R. 700).) Thus, the ALJ's conclusion that the objective medical evidence did not support the alleged severe impairments was supported by substantial evidence in the record.

The ALJ also properly acknowledged the non-medical evidence in the record, including Ms. Gigliotti's efforts to return to work, her experience of pain, and her daily activities. *See* 20 C.F.R. § 404.1529(a)(1) ("We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the

---

[10] The ALJ wrote that "at least one examining neurologist indicated there was no evidence of [a transient ischemic attack ("TIA")] or a cerebrovascular accident ['CVA']," citing Dr. David Kloth's medical note. This was incorrect: Dr. Kloth opined that Ms. Gigliotti's numbness and tingling in her hand since April 2010 suggested a CVA rather than a TIA. (R. 873.) The error is harmless, however, as the ALJ "accept[ed] that [Ms. Gigliotti was] affected [by] cervical degenerative disc disease with left radicular symptoms and the residual effects of her reported cerebrovascular accident." (R. 29.)

symptoms affect your activities of daily living and your ability work."). The ALJ considered Ms. Gigliotti's request to be released for full-time work in July 2010, and acknowledged that after she returned to work, Ms. Gigliotti experienced "severe pain," but noted that medical records indicated that those experiences were "reportedly rare and largely occurred on days when she was busy at her desk while working and not able to stand up and move." (R. 28; R. 331-33.)

The ALJ also properly noted Ms. Gigliotti's daily activities, including that Ms. Gigliotti needed assistance in performing daily chores, and that she could walk and sit in half-hour increments only. (R. 27.) Ms. Gigliotti indicated in a May 2013 report that she helped her kids with their homework, prepared meals, folded clothes, and on most days drove her kids to school and activities. (R. 251.) Ms. Gigliotti indicated that she went to her kids' school activities on a regular basis and cared for two dogs. (R. 251.) She shopped in stores one to two days per week, though she needed help with lifting and carrying groceries. (R. 252-53.) She cleaned and mowed the lawn with her kids' help. (R. 253.) She could handle money. (R. 252.) She crocheted for a couple of hours per day, three times per week. (R. 252.) *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (holding that the ALJ properly found the claimant's testimony about his limitations was not fully credible, in part based on the claimant's daily activities, such as caring for children, cleaning, and occasional driving). Thus, Ms. Gigliotti has not demonstrated that the ALJ erred in assessing her credibility.

Ultimately, Plaintiff argues that "the objective findings support her subjective complaints" of severe impairments and that "the ALJ did not have good reason to find her anything other than fully credible." (ECF No. 16-1 at 10.) But the only objective medical evidence she cites in support of this assertion is a list of imaging studies and a record of a reevaluation with Dr. Kloth, none of

which indicates severe findings. (*See id.* at 9-10.)[11] Indeed, if anything the medical records reflected a discrepancy between Ms. Gigliotti's subjective complaints and physical examination results or other objective medical evidence. (*See, e.g.*, R. 395, in which Dr. Hasbani noted subjective sensory loss in the left arm but no specific dermatomal numbness in the left upper extremity and full strength upon examination; R. 493, in which Dr. Glassman noted Ms. Gigliotti's complaint of "left sided 'foot flop'" but no sign of left foot drop upon physical examination; R. 839, in which Dr. Kloth opined that though a cervical MRI revealed "some mild left C4-5 foraminal narrowing, [he] did not feel that the described results were significant enough to correlate with the complaints that [Ms. Gigliotti] had [that day].")

Even if substantial evidence supported the opposite conclusion from that reached by the ALJ, that would not warrant remand. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). Ms. Gigliotti neither points out how the ALJ failed to consider the medical records she cites nor explains how those records warrant overturning the ALJ's credibility determinations under the deferential governing standard. Ms. Gigliotti has not met her burden of demonstrating that the ALJ's credibility determinations were not supported by substantial evidence.

## B. Medical Opinion Evidence

---

[11] In fact, one of the four cited imaging studies—which Ms. Gigliotti states "exclud[es] the mild and inconclusive results"—repeatedly refers to "mild" impairments. (ECF No 16-1 at 9, referring to a January 26, 2010 CT scan showing "mild loss of disc height," "mild encroachment on the right sided L4-L5 neural foramen," and "mild endplate spurring." (R. 779-80.))

Ms. Gigliotti next argues that the ALJ erred in assigning too much weight to the opinions of non-treating and non-examining physicians and not enough weight to those of her treating physicians.

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted). *See also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) ("the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). The Second Circuit has made clear that:

> To override the opinion of the treating physician . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and alterations omitted). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.*

With regard to non-examining agency medical consultants, "[i]t is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical

consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 204 (N.D.N.Y. 2012).

Ms. Gigliotti principally argues that the ALJ erred in giving little weight to the opinions of Dr. Thomas Arkins, her treating neurosurgeon. (ECF No. 16-1 at 13.) The ALJ correctly did not give controlling weight to Dr. Arkins's January 26, 2011 opinion in a report to the Department of Labor that Ms. Gigliotti is unable to work (R. 689), both because the opinion was not within the period in question, and because this is a determination reserved to the Commissioner.[12] *See* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *id*. § 404.1527(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[a] treating physician's statement that the claimant is disabled cannot itself be determinative"). For the same reason, Dr. Arkins's opinion dated January 26, 2012 that Ms. Gigliotti is "not work-capable" is also not entitled to controlling weight, despite coming after the alleged onset date. (R. 340.)

Dr. Arkins's March 2, 2012 opinion that there was "no surgical solution" for her left arm complaints and intermittent sciatic pain, and that if Ms. Gigliotti "wishe[d] to increase her activities, she [could] be risking making the problem worse," does not speak to the nature and severity of Ms. Gigliotti's impairment or her functional capacity. (R. 341.) With no diagnosis, explanation of Ms. Gigliotti's capacity to perform any particular function, or explanation of which activities Ms. Gigliotti should avoid or how those activities would exacerbate her complaints, Dr.

---

[12] Ms. Gigliotti maintains that Dr. Arkins is the author of this report, but as the ALJ noted, the signature (and much of the supporting explanation) is illegible and the report otherwise does not indicate which physician authored it. (R. 689.)

Arkins's opinion that generally "increas[ing] her activities" would "risk making the problem worse" is "so vague as to render it useless in evaluating" whether Ms. Gigliotti could perform sedentary work. *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (finding medical opinion that claimant had "moderate" limitations for lifting and carrying and "mild" limitations for standing, walking, pushing, pulling, and sitting was too "vague"), *superseded by regulation on other grounds by* 20 C.F.R. § 404.1560(c)(2); *see also Daniels v. Berryhill*, --- F. Supp. 3d ---, No. 16 Civ. 6339 (GWG), 2017 WL 4157370, at *9 (S.D.N.Y. Sept. 19, 2017) (holding that ALJ did not violate the treating physician rule where treating physician "never opined that any of his diagnoses resulted in specific limitations on [the plaintiff's] ability to work"). Moreover, when read as a whole, the note in which this opinion appears suggests that Dr. Arkins was commenting on the absence of any objective findings supporting Ms. Gigliotti's subjective complaints.[13] So understood, the opinion is not inconsistent with the ALJ's findings. Thus, even though the ALJ did not expressly consider this opinion, that is not a ground for remand. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand."); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (holding that where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have

---

[13] Dr. Arkins's note reads, in relevant part: "Meghan was seen in follow-up evaluation today. She still notes similar left arm complaints and intermittent sciatic pain in the left as well. She is afraid to increase her activities. We have recently done a complete spinal study with a myelogram finding no evidence of nerve root compression or mass with particular reference to the C8 level. The brachial plexus studies on MRI have shown nothing. EMGs done by Dr. Hasenfeld suggested the possibility of ulnar neuropathy but injection of the ulnar nerve in the left in the cubital tunnel gave her no relief at all. She tried Lyrica without improvement and stopped after it caused a weight gain of 20 pounds . . . . As frustrating as it is for her, I told her I see no surgical solution to her complaints and if she wishes to increase her activities, she may be risking making the problem worse and if it is significantly worse, I would be happy to reassess it. We will plan to see her again in follow-up in six months." (R. 341.)

explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability"). I thus decline to remand to require the ALJ to consider this opinion.

Ms. Gigliotti next argues that the ALJ failed to give the opinions of her other treating physicians significant weight. (ECF No. 16-1.) Ms. Gigliotti merely summarizes the medical records provided by Dr. Hasenfeld, Dr. Glassman, Dr. Bridgers, Dr. Hasbani, and Dr. Kloth, however, and does not point to any medical opinions provided to support a finding regarding her capabilities. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and the severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

The record does include observational impressions by Ms. Gigliotti's treating physicians, including Dr. Hasbani's "impression" that Ms. Gigliotti "probably had thoracic outlet syndrome" (R. 609); Dr. Gorelick's "impression" that Ms. Gigliotti had symptoms of increasing weakness and paresthesias of the left lower extremity of unclear etiology (R. 571); Dr. Kloth's opinion that Ms. Gigliotti had a CVA resulting in weakness, numbness, and tingling in her left hand (R. 838); and Dr. Bridgers's opinion that Ms. Gigliotti had a "C8 radiculopathy." (R. 700.) None of these opinions speaks to the severity of any impairments or to any functional limitations. Further, these impressions appear together with other impressions by the same doctors set forth in the same medical records that clearly support the ALJ's findings. (*See* R. 608-09 (Hasbani: "Examination of the upper extremities reveals the strength to be nearly normal in all muscle groups."); R. 571 (Gorelick: "Meghan has good strength to confrontational testing in the lower extremities bilaterally. I do not detect any foot drop on the left. She ambulates with a steady gait."); R. 838 (Kloth: "She is status post what sounds to me like a small CVA."); R. 699-700 (Bridgers: "[I]t did

not appear to me that she had an ulnar neuropathy based on those results [of electrodiagnostic testing]" and "she has only mild limitation of cervical motion.").) Ms. Gigliotti does not point out how the ALJ failed to assign significant weight to the opinions of those physicians or how those opinions support her claim that she is incapable of sedentary work.

Ms. Gigliotti also argues that the ALJ accorded too much weight to the opinions of state agency consulting physicians Dr. Khurshid Khan and Dr. Shanker Gupta. I disagree. In fact, the ALJ departed from the opinions of agency consulting physicians Drs. Khan and Gupta, who had "limited the claimant to the light range of exertion with additional postural restrictions," finding that the claimant's abilities were more restricted. (R. 30.) The ALJ noted that the opinions were from "non-examining and non-treating expert sources," and found that while they were "well explained, they [did] not account for the claimant's cervical and left upper extremity impairments." (R. 30.) Accordingly, the ALJ gave them "great evidentiary weight" but nonetheless found that Ms. Gigliotti was "more appropriately limited to the sedentary level of exertion with . . . additional postural and manipulative limitations . . . ." (R. 31.) He did so based on his decision to credit Ms. Gigliotti's testimony in part, noting that she had "consistently complained of numbness and weakness in her left arm/hand" and that this "warrant[ed] at least some restriction on her ability to finger and handle with her left hand." (R. 31.) In light of the fact that the ALJ disagreed with the non-examining expert physicians on the basis of Ms. Gigliotti's testimony and found that she was *more* functionally limited than those physicians had concluded, Ms. Gigliotti fails to demonstrate that the ALJ relied on non-treating physician opinions to an improper extent.[14]

---

[14] Ms. Gigliotti also argues that the ALJ should not have given weight to the opinions of Dr. Khan and Dr. Gupta because those doctors did not have the benefit of recent medical records (from Dr. Gorelick, but which Plaintiff erroneously attributes to Dr. Hasenfeld). (ECF No. 16-1 at 11-12.) Ms. Gigliotti herself notes that those medical records indicated that she had "no significant foot drop" and that she was "ambulating with a steady gait and was able to walk on her heels and toes

## C. Residual Functional Capacity

Ms. Gigliotti argues that the ALJ erred in his RFC determination that Ms. Gigliotti can perform sedentary work, as the ALJ's determination that she could perform "frequent fingering and handling with the left hand" does not reflect her limitations in her left hand and arm, which she claims prevent her from performing sedentary work. She also argues that the ALJ did not properly account for her inability to sit for long periods of time and her need for frequent breaks and reclining.

The RFC "is the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ assesses a claimant's RFC based on "all the relevant evidence" in the record, including "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including . . . medically determinable impairments that are not 'severe'. . . ." *Id*. § 404.1545(a)(2). The ALJ must "consider any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," and must consider "descriptions and observations" of the claimant's limitations, including limitations resulting from symptoms such as pain. *Id*. § 404.1545(a)(3).

The ALJ considered Ms. Gigliotti's need for breaks in sitting, standing, or walking, and this need does not undermine the ALJ's conclusion that she was capable of sedentary work. "As [the Second Circuit] has previously stated, the requirement that [Ms. Gigliotti] get up and move around from time to time does not preclude [her] ability to perform sedentary work." *Poupore v.*

---

and do knee bends on both sides," despite "increasing weakness and paresthesias of the left lower extremity . . . ." (ECF No. 16-1 at 11-12, citing R. 571.) Ms. Gigliotti does not explain how these records demonstrate the "high level of impairment" she claims Dr. Gupta and Dr. Khan overlooked.

*Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (citing *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)).

The ALJ also properly considered Ms. Gigliotti's left hand impairments. The ALJ's conclusion that Ms. Gigliotti was "affected by mild to moderate limitations caused by her reported neck, left upper extremity, and lower back impairments" (R. 30) was supported by the record. (*See, e.g.*, R. 335-36, Dr. Arkins's October 11, 2011 note that extension of the neck provoked mild numbness in Ms. Gigliotti's left arm, but that she showed no weakness in either arm nor atrophy in the hand upon examination, and that she had diminished reflexes in her arms but that her balance and strength appeared normal; R. 339, Dr. Arkins's December 2, 2011 note that Ms. Gigliotti "remained clumsy in the left arm" but had good strength in her hand and wrist; R. 394, Dr. Hasbani's note that Ms. Gigliotti exhibited diminished sensation of temperature and light touch, but otherwise normal sensation, normal coordination, and normal reflexes.).

The ALJ then asked the vocational expert about the functional capabilities of a person of Ms. Gigliotti's age, education, and past relevant work experience, who could perform sedentary work with certain restrictions only, and who could perform frequent fingering and handling with the left non-dominant hand. (R. 74-75.)[15] The vocational expert concluded that an individual meeting those criteria could still perform Ms. Gigliotti's past work as a health unit clerk, as well as work as a data clerk, clerical sorter, and food checker. (R. 73-74.) While the vocational expert noted that Ms. Gigliotti's past work as a unit clerk is "generally performed at the light level and is semi-skilled," Ms. Gigliotti's own past performance of that occupation at a sedentary level supported the ALJ's RFC determination. (*See* R. 31, noting that Ms. Gigliotti "actually performed

---

[15] The vocational expert also opined that she could work at certain jobs, including food checker, sorter, and telephone solicitor, even with only "occasional" use of her left hand. (R. 74.)

the job at the sedentary level of exertion since she sat for eight hours and only lifted up to ten pounds.")

Ms. Gigliotti argues that the inability to perform tasks with both hands compromises her ability to perform sedentary work, citing Social Security Rule 96-9p ("Most unskilled sedentary jobs require good use of both hands and the fingers . . . . Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.")  Substantial evidence supports the ALJ's determination that Ms. Gigliotti did not suffer from significant manipulative limitations in her left hand that would compromise her ability to perform sedentary work. While Ms. Gigliotti claims that "she is not able to lift or hold anything with her left hand," (ECF No. 16-1), she reported that she continued to prepare meals for her family, crochet, and shop for groceries and household items. (R. 251-53.) Moreover, as discussed above, medical records cited by the ALJ refer to mild impairments or examinations demonstrating full strength in her upper extremities. (R. 29-30, referring to a December 2011 examination revealing "good strength" in the left arm (R. 339), and a January 2013 motor examination revealing "full strength in the upper and lower extremities" (R. 391).) Ms. Gigliotti fails to demonstrate that the ALJ's findings regarding her left arm impairments are not supported by substantial evidence.

## IV. <u>CONCLUSION</u>

For the reasons stated above, I DENY Ms. Gigliotti's motion for an order reversing or remanding the Commissioner's decision (ECF No. 16), and GRANT the Commissioner's motion to affirm that decision (ECF No. 18). The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
               January 10, 2018